Your Honors, may it please the Court, I represent Taxpayer Gene Yamagata. My colleague Mr. Tarter represents Taxpayer Mon and related companies. In this matter we will share our time and reserve two minutes. Ours is a wrongful disclosure tax information claim against the Internal Revenue Service under 6103 and 7431. We appeal from a summary judgment claim improperly granted. I will focus on count 1, the count that says false information is not an approved disclosure under 6103 and 7431. I have in my hands, Your Honors, simultaneous exam proposal. What do you have in your hand? Simultaneous exam proposal. Are you talking about Excerpt of Record 550? Yes, and also in full text at 350. It is dated April 26, 1996. It falsely accuses the taxpayers of tax fraud. It falsely accuses specifically of failing to report income in the estimated or supposed estimated amount of $32,116,000 for the tax years 1991 and 1992. And then it generally accuses of tax evasion and falsely so. Incredibly, just months before the April 1996 simultaneous exam proposal, Mr. Smith, who wrote the proposal himself and others within the IRS had systematically categorically identified the fact that every single penny had indeed been paid and that the $32,116,000 figure was a figure that was improper on the part of the Internal Revenue Service. One of the basic assumptions of your argument is that somehow the government, when they send out this information pursuant to a treaty to a foreign country, is somehow verifying that it is true. That is, they're not just sending information. They're indicating that this is true information. It's not false information. The Fourth Circuit took a look at that and it isn't a holding in the case. Its footnotes can be damaging, but at least there's some reasoning there that no, the idea is to get information over. If in fact you required the government to verify that it's true, that it would chill the whole idea of exchanging information. Therefore, they conclude in dicta that it's irrelevant. Now I understand that's not a holding, but the idea is one that struck me as worthwhile looking at. That is, your argument assumes the government is going to be liable if it sends out false information. The Fourth Circuit is saying, no, that's not what they're doing. They're trying to get information out pursuant to a treaty. What's your response to that? The Fourth Circuit case of malice is the reference I assume that you're talking about. Malice, I think, stands for the proposition that false information is not appropriately disclosed information. And there is, in that material, that is a case in which the agent sent information to various individuals indicating that there had been a conviction of malice in his partner Jones. It was false because there had been a reversal of that conviction and the court indicated that they knew that they had an obligation to only disseminate information that was true. And the dissemination of false information relating to taxpayers' malice in Jones gives rise to liability. And I think it's not just dicta, it's the language of the courts. I mean, take our case. They claim falsely and knowingly falsely because Smith himself, within the period two months before that, had finished the audit. He knew that Mr. Yamagata, he knew that Mr. Maughan had declared every single penny of the income from the commissions they received. And for him to state that there is an estimate Well, I understand. But there's apparently, from the record, thousands of these things go out. It isn't just one or two. And what you're saying is, in every instance, the government has to make an investigation to see if it's false or not? No, but they can't send false information. And if they do affirmatively Well, that seems to me to be just opposite of what they're trying to do, is to disseminate information. What you're saying, they can't check it, but they can't send it. They have to check it to find out if it is false. Two points in response to that. Yes, there are hundreds of thousands of documents exchanged, but there are very few simultaneous exams. And the simultaneous exams, in this case, had information that the IRS agent knew was false. He had an obligation to send information, not to check everything, but if he knew something was wrong, then he had an obligation, absolutely, not to disseminate that false information. The simultaneous exam proposal carries with it additional allegations. For example, was it an estimate to falsely advise the Japanese government that Mr. Yamagata was siphoning money out of FOP Japan? And that's the quote, and it's wrong. Now, going back to the issue of an estimate, an estimate without a basis is unauthorized. An estimate without actual knowledge that the estimate is false, even more so, I refer your honors to the case of Harrison. In the Harrison case, the court quotes Prosser and says, indeed, the fact that an estimate must carry with it an understanding and a knowledge that, indeed, the truth has been passed on. Would you save some time for the statute of limitations problem? I'm a little worried by trying to figure out if it really ran, and if so, when. But apparently, this two-year statute applies to both counts, and if your opposition is right on that, we're never going to get to the issue that you're arguing. Could you give me some help on that? I'm not sure I understand the dates, and I'm not sure when it starts, and I'm not sure how it applies here. Other than that, I'm clear on the point. Let me see if I can explain that for you, then, your honor. 7431D does, indeed, have a two-year statute. It's two years from date of discovery. There is an argument here that that statute is jurisdictional, and the reference is a case in the Fifth Circuit. It's the Gandy case. Gandy is not the law in the Ninth Circuit. But there's now a Supreme Court case, General Sand and Gravel. The Sand and Gravel case is a case involving the Court of Claims. Their statute specifically references jurisdictional. Cedars-Sinai... It seems to me that the principle that is expressed in John R. Sand and Gravel is quite a bit broader than the use of the word jurisdiction. It looks a little bit, it seems to me, at the function and structure of the statutory scheme to determine whether the statute is a condition of the waiver of sovereign immunity because it's intended to protect the government from stale claims or assist in the administration of claims and so on. So applying those broader principles, do you think that this statute is or is not jurisdictional? I do not think it's jurisdictional, your honor. I think that J.R. Sand and Gravel is specific to that court. Yes, there are broader principles, but it does not overrule Irwin. It does not overrule Cedars-Sinai. This circuit in Cedars-Sinai very clearly has said that run-of-the-mill ordinary statute of limitations are not jurisdictional. And then in order for that statute to be jurisdictional, it has to specifically say that it is so. And that does not occur in this statute under 7D431. Now, it is our position that even if it were jurisdictional, it doesn't apply because we did not discover the facts that give rise to the basis for Count 1 until after this litigation began, almost two years after. As a matter of fact, the simultaneous exam proposal was concealed from us. It was supposed to have been produced in 1998 pursuant to a Freedom of Information Act request, and the government specifically, well, Mr. Smith and one of his associates specifically blocked that production even in contravention to the order of the district court below. They also violated the Internal Revenue Manual in not appropriately responding. You got your Freedom of Information Act information in August of 1998. Is that correct? No. We did not, Your Honor. We got some information in August of 1998. The information that gives rise to Count 1, we did not get until 2001, almost two years after we filed the matter in this complaint. Well, there was some req ---- in August of 97, there was some request or a document that looks like you may have had knowledge. What is that about, the charges that you knew about it then? In August of 97, counsel for Mr. Mahan got some information under the Freedom of Information Act, including an August 21st letter. That August 21st letter says, it is an inquiry, it is critically important that we know the extent to which these erroneous statement positions have been communicated ex parte to various governments. That is SCR 1. That letter demonstrates that we didn't know. We are inquiring. And it is not until, like I said, two years later that we got that information. I'm sharing time with my colleague, if I may. I've run over. I apologize in response to your questions, but, and then we'll reserve. Sorry. So how much time do I have? About a minute. If it pleases the Court, my name is Tim Tarter. I represent the Mahan Plaintiffs in Alavera of America. I want to touch ---- What issues do you want to focus on? Pardon me? What issues do you want to focus on today? I want to focus on the Count 2. And before I start, I'd like to address Judge Wallace's question about whether or not the IRS is a negligent statute. If the IRS acted negligently, and that's what malice holds out of the 4th Circuit, if the IRS must be careful before it sends out information to a foreign country or to anyone, you know, 6103 allows the exchange of information with, let's say, State Department of Revenue. And all we're complaining about is that the IRS should have been careful with respect to the false statements. There's indication of willfulness. And again, remember, we're at the summary judgment level, but there's an indication of willfulness in the record. We're simply asking the Court to recognize that 7431 is actionable, as the District Court stated in 2000. If the IRS knew or should have known, based upon the alleged prior history of mutual relations with the Japanese National Tax Administration, that the latter routinely failed to comply with the terms and conditions of secrecy, the IRS's disclosure of any return information, whether true or false, to the NTA was not authorized by the Convention or by statute. The IRS must recognize that if Japan was an unsecure recipient, it had no business releasing taxpayer information to that insecure recipient. All right? That's the essence of Count 2. I would like to reserve the remaining time for rebuttal. Thank you. May it please the Court, I'm Karen Gregory for the United States of America. Could you move the microphone just a little closer to you? There you go. Thank you. Is that better? Yes, that's a lot better. Much better. Shorter than they are. The appellant's representatives just spoke for over eight minutes, and they have not identified a single legitimate reason why the United States should have to pay damages in this case. Let's pause for a minute and consider what this case is about. The Japanese media published an unfavorable story about a Japanese company. And the company's principals decided that they were going to blame the Japanese tax authorities for that story. So what did they do? They sued the United States. They're suing the wrong government, the wrong legal theory. They filed a baseless complaint against the United States and went on a seven-year-long fishing expedition, trying to find a claim that would stick, amending their complaint repeatedly. They never found one. Even today we're hearing new claims that weren't in the third amended complaint. There are only two false statements at issue here, not other content of the simultaneous exam proposal. But that's irrelevant, and their failure to prove up their factual claims is irrelevant, too, because they haven't stated a claim upon which relief can be granted. And the district court's judgment should be affirmed on that basis. The district court was correct on the merits, but it did make an erroneous statute of limitations ruling. And if this court allows that ruling to stand, it will create a split with the Fifth Circuit, which has said that that statute is jurisdictional. There's no question that Congress intended the statute of limitations within Section 7431D to be one of the prerequisites for jurisdiction. The statute clearly says, notwithstanding any other provision of law, and this is 7431D, an action to enforce any liability created under this section, that's the waiver of sovereign immunity. And this language directly relates to that. This is not one of the generic statutes of limitations in 28 U.S.C. 7431 is a self- How do you deal with Cedars-Sinai in our circuit? Cedars-Sinai? Yes. Cedars-Sinai was incorrect, but this court did not It doesn't make any difference. It binds us. If it were the same statute of limitations. However, in Cedars-Sinai, the court recognized that Congress may indicate that it intends something else, which it did here. And the court in this case, in the Alavera case, relied on a statement in Cedars-Sinai interpreting the Supreme Court's decision in Irwin, which was inconsistent with the recent John R. Sands and Gravel case, in which the Supreme Court explained that Irwin was not, should not be interpreted as this court had done in Cedars-Sinai. That it only created, excuse me, that Irwin only created a rebuttable presumption that there could be equitable tolling, and this was never argued as an equitable tolling case. But Irwin only created rebuttable presumption of equitable tolling, but if Congress indicated that it intended something else, then the statute of limitations would be jurisdictional, which is what Congress did in this case. I have a question about, assuming that we were to agree with your interpretation, how we would apply that here. Would we have to remand to the district court for a determination of the time the plaintiff discovered the specific disclosures that are at issue here, or is this something we can do for ourselves on appeal? It's the government's position that there's ample evidence in the record that you can do that for yourselves here. I don't think we judge for ourselves. We just review what judgments the district court made, and I suppose the question is, is it that clear that we can say when it happened? Well, the, and I'm sorry, I just interrupted you. The district court apparently thought it was clear in its first, in its order granting the government's motion to dismiss, the first motion to dismiss, which, although the complaint was dismissed, the court allowed the plaintiffs to amend to assert timeliness, but... Except, let me just... The court, I'm sorry. Well, I just, I'm doing this from memory without relooking at it. It seems to me that the district court used a phrase that the plaintiffs knew or should have known, which is not what the statute says. So did the district court, when it was thinking about this question, apply the correct standard even under a jurisdictional reading of the statute? In other words, did it apply plaintiffs actually knew or plaintiffs knew or should have known, which is a different question. Well, I may be reading what the district court held a little bit different than you, and again, I'm not, you know, I'm just doing this from memory, but what I do know the district court said was that the false claim statement, which were the ones where they're alleging they didn't know until later about those two specific false claims, the district court held in footnote 16 of its original order that those, the false statement claims were subsumed by the larger claim, which was that any disclosure to the Japanese was inappropriate. So you have to take a look at... I don't understand that answer. If there were 15 disclosures and some were timely and some not, wouldn't they be submitted? I'm sorry. I got sidetracked from your question. The statute of limitations under 7431 begins to run upon discovery of a disclosure. Correct. There are several disclosures and perhaps several discovery times. Right. Whether or not that disclosure is authorized is what gets litigated. And whether or not liability will be imposed on the disclosure is found to be unauthorized and whether there's no good faith defense. The statute doesn't begin to run based upon the taxpayer's subjective decision some point in the future that this disclosure was not... Okay. I'm sorry. But I have really a pair of questions. The first is, did the district court properly look at the question of when plaintiff discovered the disclosures? Or did the district court erroneously say when the plaintiff knew or should have known of the disclosures? That's my first question, whether the district court applied the correct legal standard. The second has to do with whether it is plain on the face of the record or whether it would have to go back for further fact-finding by the district court as to when the plaintiff discovered the disclosures. Okay. You have to sort of separate the two claims for this purpose, as you've sort of indicated. And the district court, because the statute of limitations ruling was so early on in the proceedings, at that point it was ruling on a motion to dismiss, in which case it had to accept the allegation of timeliness as true. So in terms of the so-called factual allegation, the court at that point said that the allegation that the taxpayers did not discover the disclosures until well into the litigation was sufficient at that point to proceed. And that decision was based on, in our opinion, an erroneous interpretation of at what point the statute begins to run. Under taxpayers' theory of the case, any disclosure to Japan was unauthorized, because they claim the IRS knew that the Japanese tax authorities would leak the information. So the statute of limitations began to run when they learned that information had been shared with the Japanese. That claim is clearly untimely. Statements in their third amendment complaint, a letter and the record indicate that they knew more than two years before the complaint was filed that disclosures had been made to Japan. There's no question. The second claim, I mean, excuse me, the count one, which deals with the false statements, is sort of in a different area. And we disagree with the taxpayers' assertion that MALIS stands for the proposition that a false statement can never be relevant, or that a false statement is always unauthorized. MALIS simply says that a statement is unauthorized if it doesn't fall within an exception in 6103. In this case, we have 6103K4, which allows disclosure to a treaty partner. The content of that information is not what 7431 regulates. Therefore, the fact that within that massive amount of information there were certain minute statements that the taxpayers may not have discovered until later on doesn't save their case because they lose on the first argument. Well, that's different from the statute of limitations argument, it seems to me. Maybe I'm not following your logic, but let's assume for the sake of argument that there is an actionable disclosure made at a different time, doesn't the time run from that disclosure and not from an earlier disclosure, even if you've got a series of disclosures that relate to the same general transaction? It's a difficult question to answer. Otherwise. Right, I understand what you're saying, but this is sort of different, and you always want to think about, I don't know if you're thinking continuous torts or something like that. I'm talking about discrete acts that constitute a cause of action, I'm not relying on a continuous tort theory. But under your theory, if they discover the first unauthorized disclosure, that if they discover some other unauthorized disclosure related to that later, they can't litigate that because the statute has already started running. I would say in that case it would depend on the facts of that particular situation. Judge Greer was just asking a different, I mean, she started off asking, I thought, a pretty simple question. Right. Separate disclosures start separate statutes running, as a general matter. As a general matter, that's correct. One of the questions. So then it's up to us to determine whether or not, or the court, whether or not there's a sufficiently independent disclosure that is actual in and of itself, right? Correct. All right. It's up to the court to decide. And as I said, the judgment on the merits was correct. We're not challenging that. The government should have won here. If this court finds that the statute of limitations was jurisdictional, then we believe the judgment should be vacated and the case dismissed with prejudice. We believe there's enough information in the record that a remand for that purpose would be unnecessary. We also believe that a remand on any issue here would serve no purpose, because a trial on a legal theory that doesn't hold up can accomplish nothing. And also, I want to point out that this is, 7431 is not a statute that goes after fraud. And in fact, in the Federal Tort Claims Act, which is not in our brief, but since he raised fraud, this was raised below, the Federal Tort Claims Act excludes statements of government employees from that waiver of sovereign immunity. Could I just bring you back to an issue that was raised earlier, and I'm not sure I have your position on this? There is a theory that what this statute does is try to increase information, period. That is, that governments will help each other to find where there is fraud when they cross lines, cross country lines. If that's it, then the chilling argument comes up that if you require the government or the IRS to do anything with that information to validate whether it's right or wrong, it'll stop the flow of information, which is the purpose of the treaty. Counsel says, no, that's okay, but if the IRS knows it's improper treatment, that it's incorrect, if the IRS knows because the IRS has already evaluated it, then in that instance, they must not send it. Now, I'm not sure how that fits into the statute, but I'd like to have your response to that theory. It doesn't fit into the statute because it's not a requirement of the statute, and the statute being a waiver of sovereign immunity must be strictly construed in favor of the government. And you were exactly correct. These disclosures were intended to continue a free flow of information between the countries to ensure that taxes are being reported and paid properly in both places. And the minutia of the statements within those disclosures is a matter for the executive to regulate. The courts don't want to get into that. I don't understand. What you're basically saying is that the statute doesn't provide a cause of action at all. Right. I'm saying that, in fact, if the government knowingly gives and maliciously gives false information to another country with the intent of it being disclosed, that's not this case, I don't think, but it could be. There's no liability. There's no cause of action. Is that what you're saying? If the government, well, I think it would depend on the facts of the case. I don't want to say no, because it would sound really bad, obviously. But within 6103, within 6103, it just has to be to the extent provided in the treaty. Now, if there were false statements made that had nothing whatsoever to do with the facts of the case, what was being examined, that would be a different story. I understand the difference of detail, but basically what you're arguing for is a very broad exemption for the government. And Congress did, in these statutes, provide for a remedy of sorts, right? Yes, but Congress also provided the good faith defense. And again, we're back to the facts of the case. So then you go to the good faith problem. So what you're saying is that if I understand your response to the argument, which makes some sense, as he said it, your argument is, as I understand it, that this is a very limited liability that the government is allowing to lawsuits, that if the government intended to have that part of it excluded, it would have done so in the statute. And essentially you're saying that has to be taken up with the Congress, not with the court. As I understand it, that's your argument. And so you would not, even though it might seem beneficial, you're saying the IRS can't do it because of the construction of the statute that you have to follow. I'm not sure I'm following your last part. The IRS can't disclose? No, the IRS can't go through and verify whether things are right or wrong. And even if they know it's wrong, they can still send it because that's what the statute says. And the limitation on being able to sue the government doesn't go far enough to capture the negligent conduct of the government. That's what you're indicating. Right. The statute, neither the statute nor the treaty obligate the government to certify all the information that it's exchanging with the other side. Let me ask a slightly different question. Why, in a sense, I mean, the idea is you're changing, you're exchanging pertinent information to avoid tax or fraud and other things. But if the government knowingly gives false information, knowingly gives false information, why is that pertinent to the investigation of fraud? How does it fall in the definition? Isn't it by itself the provision, knowing provision, knowing sharing of false information excluded from protection? Within the treaty context or just as a general matter? I mean, the treaty, I mean, if I understand how this operates, and I understand the point that Judge Wallace has been making, that the idea is to have a free flow of information so that each government can investigate potential tax fraud and other activities. But if a government's giving false, knowingly giving, not negligently, knowingly giving false information, why is that important? How does that fall within the pertinent information that's relevant to the investigation of tax fraud and, therefore, subject to protection? That would be a different question, because that's what they're alleging, but they haven't demonstrated that that's what happened. I know you can talk about the merits, but why isn't that a legitimate cause of action then? Why isn't it a legitimate cause of action? You started off your argument by saying this is terrible, it's frivolous, it's not authorized under law, we don't need to go beyond the pleadings. But, in fact, if I understand their theory correctly, they're saying, look, this is a knowing provision of false information, and, therefore, it's not protected by the treaty, because the treaty, even though it protects the exchange of information, it may protect the exchange of false information, the government doesn't have to certify, it doesn't have to look, but if a government official knowingly provides false information, that can't be relevant to the prosecution of fraud on either side of the Pacific. But I think that would then sort of move into Bivens territory. If an individual government employee is violating someone's rights, that's a different question than what we're dealing with here. You're talking about a tort, aren't you? No, I understand what you're saying as well, but we're talking about protections of the treaty and what's pertinent information. Why is false information, knowingly knowing false information, pertinent information on the treaty? If there were, in fact, a knowingly false statement made with respect to a general manner that was pertinent to the treaty, that might be problematic, but that's not what happened here. Whether or not income is being reported or underreported in the United States is pertinent to the treaty. What prices and commissions are being paid are pertinent to the treaty. Okay? That's where 6103's inquiry ends. So far, but let's say the government knows it's completely false. Why is that pertinent information on the treaty? Because false information can't serve the basis for any tax fraud investigation. I'm not talking about the negligent stuff or just saying, okay, here are some estimates, and you have to analyze them for yourself, and they're just estimates and so forth. I'm talking about the knowing provision of false information. It's a theory. I know you're taking this back and saying it's not this case, but it's a theory. Isn't that outside the scope of the protection of the treaty? Not when you're looking in the context of sovereign immunity, because while as a theoretical matter, that is arguably problematic, the question is, are damages available? And this case is really here for damages, not on the to argue this legal theory. I mean, it's part of their case, obviously. So if information absolutely knowingly, you know, Mr. Yamagata beats his wife or something, but it has nothing to do whatsoever with the treaty, that would be a different story. That's not what happened here. And in that case, even the wife example, there wouldn't be a good faith defense. That what happened is another part. We're trying to get the groundwork of what we're going to apply. Now, you've taken the strong position that in order to make sure that a max amount of information goes, anything goes and the government's protected. They have not, under the statute, given away any more liability than that. Once you start having exemptions, and maybe there is, but it seems to me you open up a different issue, ultimately we will say whether or not it fits, but we have to start with where it is, and I'm not sure where you are now in that. Let me ask you a hypothetical question. Suppose in this packet that gets together, it's really my tax stuff, and they had inadvertently put it in there. Or perhaps there's somebody in the IRS that doesn't like judges, and maliciously and willfully they put some stuff in there that later damages me. Is the government protected in either of those situations? The government is protected under 7431. Whether it's protected elsewhere is, you know, I haven't prepared on that issue. Okay, okay, I see what you're saying. What you're saying is the government's protected under this statute, but they may be liable under some Bivens action, or people may be liable under some Bivens action, or there may be a court of claims case or whatever. Right, and I'm not making any, you know, argument with respect to that because I'm not up to speed on that. But you're starting at the... The government's position is within 7431, those types of things are not governed by this. This is just whether, under the exception to 6103, information can be exchanged. And if information... And even if it's wrong information. Judge Thomas makes a good point. Is wrong information, quote, information under the treaty? That is, is it pertinent information, or is it just any information? What's the protection? Okay, so we're talking about the treaty because... So if there were completely off the wall, irrelevant, having nothing to do with the purpose of the treaty, I would say that's not pertinent. But that's not the case. So if somebody intentionally communicates false information with the intent of harming someone, I know this is an extreme example, but a government official knowingly communicates false financial information to another country with the intent of harming it, and with that sole intent, how can that be pertinent to the treaty, information pertinent to the treaty? In that extreme example, I would say it's not pertinent because it has, you know, it's not relevant. Well, that's an interesting issue. I think we've taken your time with your questions, but I want to make sure everybody's asked the questions they want to. Thank you. And we'll give you some time for rebuttal. Thank you, Your Honor. Your Honors, may I respond, please, to the issue relating to the effects, if you determine that it is or is not jurisdictional. If you determine that it's not jurisdictional, then it's not before this Court. That was not an issue that was raised in the motion for summary judgment. It was not an issue that was appealed. It was raised in the original complaint in the motion to dismiss and the second motion to dismiss and denied in both, but never appealed here. So if you apply Cedars-Sinai, saying that it's not jurisdictional, then, indeed, you do not need to address the specific issues and determine it. If you determine that it is jurisdictional, either because Cedars-Sinai doesn't apply to this particular statute or because John R. Sand and Gravel implicitly overrules it, where do we stand with respect to the ultimate conclusion to be drawn from that with respect to your complaint? Both claims are still extant because discovery did not occur on the first count until September of 2000. And one, when we were given the information in discovery, including the information that has the false accusations that there was... Did the district court make findings that are sufficient on that point, or would we have to send it back for the district court to... You would have to send it back. Let me address one thing relating to the other issues that were discussed as to whether or not pertinent information is required and whether or not false information is pertinent. Clearly, under the treaty and under the statute, pertinent information is the standard in order to assess whether or not there's a violation. Is it state pertinent information in the treaty or the statute? The word pertinent is used in relationship to tax administration. Yes, it is. And when you look at the statute, 7431, it talks about civil damages. And by the way, below we were not yet to the position of damages because bifurcation. Our experts were working on the reports at the time that the judge's order came down dismissing and granting the summary judgment. So a discussion concerning damages is premature at this time. It would be speculative on the part of the government. However, the statute says civil damages for unauthorized inspection or disclosure of returns and return information broadly defined elsewhere. In general, if an officer or employee of the states knowingly or by reason of negligence inspects or discloses any return information with respect to a taxpayer in violation of any provisions of Section 6103, such taxpayer may bring a civil action for damages. You addressed the purposes of the treaty. Let's also address the purposes of 7431. Purposes of 7431 are to ensure that there is appropriate tax administration by promoting to the public the concept that their tax returns are not to be disclosed, that they are secret under most circumstances. That purpose is met if indeed the government is proscribed from taking actions like they took here. And again, I return to the simultaneous exam proposal that indicate that there is an estimate of $32,616,000 worth of unreported income. That statement being made within months after the very author of that letter had specifically determined that neither Mr. Yamagata nor Mr. Maughan had indeed been not disclosed and not included in their returns every single penny. They knew it was false. They should never have sent that, and it is not protected and it's not pertinent. And that's all I have to say, unless you have questions. Thank you, Counsel. Thank you. Thank you all for your arguments, very helpful this morning.
judges: Wallace, Thomas, Graber